



FILED

JUL 3 0 2003

AT 8:30_____ M.
WILLIAM T. WALSH, ES,
    CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| WILLIAM T. WALSH, ES., | : |  |
|  | : |  |
|     Plaintiff, | : |  |
|  | : |  |
| -v- | :Civil Action No. 01-CV-6118 (JEI) |  |
|  | : |  |
| FLAGSHIP DEVELOPMENT CORP: |     Civil Action |  |
| INC., et als, | : |  |
|     Defendants, | : |  |

|  |  |  |
|---|---|---|
| PAULINO BONDS and GLORIA | : |  |
| GADSON, | : |  |
|     Plaintiffs, | : |  |
|  | :Civil Action No. 02-CV-1576 (JEI) |  |
| -v- | : |  |
|  | : |     Civil Action |
| FLAGSHIP DEVELOPMENT | : |  |
| CORP., INC., et als, | : | **JOINT FINAL PRE-TRIAL ORDER** |
|     Defendants, | : | **PURSUANT TO L. CIV. R. 16** |

The following shall constitute the Final Pretrial

Order pursuant to R. 16 of the Federal Rules of Civil

Procedure, and this Final Pretrial Order shall govern the

conduct of the trial of this case.  Amendments to this

Order will be allowed only in exceptional circumstances to

prevent manifest injustice.  Counsel are urged to move to

amend in a timely fashion any portion of the Order that

must be changed or modified between the filing of the Order

and the trial date.

APPEARANCES:

> James P. Grimley, Esquire
> Goldenberg, Mackler, Sayegh, Mintz
> Pfeffer, Bonchi & Gill
> 1030 Atlantic Ave.
> Atlantic City, NJ 08401
> **Attorney for Plaintiff, Lyles**

> Randolph C. Lafferty, Esquire
> Youngblood, Corcoran, Lafferty, Stackhouse,
> Hyberg & Waldman
> 3205 Fire Road
> P.O. Box 850
> Pleasantville, NJ 08232
> **Attorney for Plaintiff, Bonds & Gadson**

> Louis M. Barbone, Esquire
> Arthur J. Murray, Esquire
> Erika A. Appenzeller, Esquire
> Jacobs & Barbone, P.A.
> 1125 Pacific Avenue
> Atlantic City, NJ 08401
> **Attorney for Defendant Flagship Development Corp.,
> Inc.**

> Karen M. Williams, Esquire
> Jasinski & Williams, P.C.
> 1125 Atlantic Avenue, Suite 101
> Atlantic City, New Jersey  08401
> **Co-Counsel for Defendant Flagship Development Corp.,
> Inc.**

## PART I.    JURISDICTION AND BRIEF SUMMARY OF CASE:

This litigation arises out of the alleged wrongful termination of the plaintiffs from their employment with the defendant, Flagship.  The Flagship, located in Atlantic City, is in the business of selling timeshares.  The plaintiff, Lyles, who is black, was employed as a telemarketing manager at the Flagships' telephone communications center, which was located in Brigantine, New Jersey. The Plaintiffs Paulino Bonds and Gloria Gadson were both Team Leaders in the telemarketing department of the Defendant, Flagship. Bruce Kaye is and was, at all relevant times, the President and CEO of the Flagship.

Plaintiffs allege that they were wrongfully terminated because of the defendant's utilization of a polygraph examination in violation of both Federal and State law. Specifically, the defendant's conduct violated 29 U.S.C. §2001 et. seq. and N.J.S. 2C:40A-1, and, as such, Federal Court jurisdiction is invoked pursuant to 28 U.S.C. §1331.

The plaintiffs further allege that they were subjected to discrimination in the workplace pursuant to the New Jersey Law Against Discrimination, codified as N.J.S. 10:5-1 et seq.  Specifically, the plaintiffs were discriminated against because of their race and/or nationality because the defendants created and/or maintained a workplace that had a pervasive scheme, plan, and/or design to discriminate against black and/or African-Americans. Further, the plaintiffs allege, because of their race and/or nationality, were terminated because of those reasons and/or for not taking the polygraph examination as set forth above.

\*     Defendants generally deny the allegations and claim they are entitled to an exception to imposing liability for administering polygraphs.

## PART II.   STIPULATED FACTS:

Defendants will not be stipulating to any facts and all facts will be deemed contested.

## PART III.  PLAINTIFF'S CONTESTED FACTS:

A.     Plaintiff intends to prove the following contested facts in regard to liability:

    (1)   Romonowski requested that Danielle Lyles submit to a polygraph on two separate occasions.

    (2)   Romonowski requested that Gloria Gadson submit to a polygraph on one occasion.

    (3)   Charley D. Tidwell, Referral Director/Marketing Production Manager of defendant Flagship, told Gloria Gadson that if she had taken the polygraph examination she would have kept her job.



(4) Romonowski requested that Paulino Bonds submit to a polygraph on one occasion.

(5) Howard Alter, Vice President of Operations of defendant Flagship, told Paulino Bonds that if he submitted to the polygraph examination his employment would be secure.

(6) The Flagship had a policy whereby, if cause existed, employees would be subjected to polygraph examinations.

(7) That the polygraph given to Charlotte Blake was a significant factor in the decision to terminate the plaintiffs and that the plaintiff's refusal to take the lie-detector test was a substantial factor in the decision to be terminated.

(8) That the atmosphere of racial discrimination at the Flagship was both pervasive and subtle and included racial slurs; references by Flagship management to Plaintiffs Bonds and Gadson that they "made a lot of money for a black person"; that during the alleged "investigation" only African-American persons were requested to subject themselves to a polygraph examination; that Plaintiffs Bonds and Gadson were replaced by Caucasian employees.

(9) The plaintiff's refusal to take the lie-detector test was a substantial factor in the decision to terminate her.

(10) The Flagship referred to African American employees as SPECS.

(11) Management held meetings regarding the plaintiff's termination to discuss what the company "line" would be as to the terminations.

(12) Management decided to utilize the incident of the alleged theft to hire "better quality people" and hiring personnel at the Flagship were instructed to "be careful" regarding the hiring of individuals and that they "should keep the ghetto out of the office"

(13) Management discussed decreasing the amount of minority employees and implemented a program to reduce the percentage of African-American employees by approximately thirty (30) percent.

(14) Management instituted a policy of decreasing the amount of minority employees in order to get the "ghetto out."

(15) Bruce Kaye knew the contents of Romonowski's report before terminating the plaintiffs.

(16) Bruce Kaye and the Flagship, along with Romonowski, had reservations as to whether the plaintiffs were involved in the theft.

1.   The Flagship was an employer engaged in or affecting commerce for purposes of 29 U.S.C. §2001 et. seq.

2.   Danielle Lyles, who is African American, became employed by the defendant Flagship on or about July 6, 1998.

3.   Paulino Bonds, who is an African American, commenced his employment with the defendant Flagship on or about June 16, 1997.

4.   Gloria Gadson, who is an African American, commenced his employment with the defendant Flagship in May of 1998.

5.   The Flagship was and is in the business of selling timeshares for its Atlantic City property.

6.   At that time of her termination, Ms. Lyles was employed in the telemarketing department, which is located in Brigantine, New Jersey, as a telemarketing manager.

7.   At the time of his termination, Mr. Bonds was employed in the telemarketing department, which is located in Brigantine, New Jersey, as a Referral Manager.

8.   At that time of her termination, Ms. Gadson was employed in the telemarketing department, which is located in Brigantine, New Jersey, as a Referral Manager.

9.  There had been prior incidents of theft occurring in the Brigantine Phone Center before the Blake incident.

10. In mid-December, 1999, a co-employee of the plaintiff Lyles, Charlotte Blake, alleged that she had been the victim of a theft while in the Brigantine Phone Center.

11. Bruce Kaye, President and CEO of the Flagship, retained Fred Romonowski, a private investigator, to research and investigate the alleged theft.

12. Fred Romonowski was acting as an agent of the Flagship throughout the course of his investigation.

13. Romonowski requested Danielle Lyles, Paulino Bonds, and Gloria Gadson each submit to a polygraph examination.

14. Flagship management was apprised that Romonowski had requested certain employees to submit to polygraph examinations.

15. Romonowski requested and was given authorization to give Blake a polygraph examination because there were reservations regarding Blake's veracity.

16. The result of Blake's polygraph was a substantial factor in the decision to terminate the plaintiffs.

17. Plaintiff was terminated on January 12, 2000.

18. Lyles' termination was ordered by Bruce Kaye.

19. Plaintiffs, Paulino Bonds and Gloria Gadson, were terminated from their employment with the defendant Flagship on January 13, 2000, with the stated reason being that they had lied on their employment applications.

20. The termination of the Plaintiffs was ordered by Bruce Kaye, President and CEO of defendant Flagship.

21. As of the date of the termination of the Plaintiff, Paulino Bonds, the defendant Flagship did not possess a copy of Mr. Bonds' employment application nor does



Defendant Flagship know whether Mr. Bonds ever completed an application.

22. As of the date of the termination of the Plaintiff, Gloria Gadson, the defendant Flagship did not possess a complete copy of Ms. Gadson's employment application.

B. Plaintiff intends to prove the following contested facts in regard to damages:

(1) The nature and extent of the wage loss suffered by the plaintiff, Danielle Lyles.

(2) The emotional distress that was suffered by the plaintiff as a result of the defendant's conduct.

(3) The defendant's conduct was willful, deliberate and malicious to warrant punitive damages.

(4) The emotional distress that was suffered by the Plaintiff Bonds as a result of the defendant's conduct.

(5) The nature and extent of the wage loss suffered by the Plaintiff, Gloria Gadson.

(6) The emotional distress that was suffered by the Plaintiff Gadson as a result of the defendant's conduct.

(7) Entitlement to damages and counsel fees pursuant to the Federal Polygraph Protection Act, pursuant to 29 U.S.C. §2001 *et. seq.*

(8) The nature and extent of the wage loss suffered by the Plaintiff, Pauline Bonds.

## PART IV.   DEFENDANT'S CONTESTED FACTS:

**A.   Defendants intend to prove the following contested facts with regard to liability.**

(1) Lyles started with Flagship as a part-time data entry clerk in July of 1998 and six to eight weeks later became a full-time data entry clerk.

(2)   Lyles had a "great relationship" with her immediate supervisor Dave Love ("Love") and a "very good relationship" with her other supervisor Howard Alter ("Alter").

(3)   Lyles claims she was given a supervisory title of Data Entry Manager at some point in time.

(4)   After becoming Data Entry Manager, Lyles' relationship with both Love and Alter remained the same.

(5)   Lyles claims there were "some statements made" regarding racial discrimination at the Flagship after her hiring, but prior to her termination on January 12, 2000.

(6)   Lyles claims Alter would refer to people of color as "you people" and Love had a lot of run-ins with people of the black race, but "not too much with [herself]".

(7)   Lyles never complained about any of this to either Alter or Love.

(8)   Lyles claims she felt the her Caucasian managers did not have full confidence in her.

(9)   Lyles never made any written complaints to anyone about the alleged racial discrimination or harassment.

(10)  Lyles described Nobel's treatment toward her as "rude", but no racial names or racial references were ever used.

(11)  Lyles was aware that Flagship had a Human Resources Director, Susan Tunney ("Tunney").

(12)  Lyles was aware that any employment complaints at Flagship were to be directed to Tunney.

(13)  Lyles never went to Tunney with any complaints about Flagship.

(14) Flagship had a policy of loaning money to employees and Plaintiff Lyles took advantage of that policy.

(15) Lyles confided in Love in the end of 1999 that she was having financial difficulties.

(16) As a result of that meeting, Love and Alter approved a $1,000 loan from Flagship to Lyles.

(17) Lyles never repaid said loan, claiming that Love forgave the debt upon her termination.

(18) Lyles claims she was terminated by Love and Alter and the reason given was that "Mr. Kaye did not feel comfortable with me in the office anymore, that he had decided to terminate me".

(19) Lyles claims she was terminated for both her race and refusing to take a lie detector test.

(20) Lyles herself had been the victim of theft in the workplace and was fully reimbursed for her loss by Flagship by and through Love.

(21) Flagship had a history of thefts in the workplace.

(22) Lyles found the hiring of a Fred Romanowski ("Romanowski"), a private investigator, to look into the theft of Charlotte Blake's ("Blake") theft a positive step by Flagship.

(23) Lyles was present when Blake made her complaint of theft on December 15, 1999.

(24) Lyles knew that Blake had implicated her in the theft on the day it happened.

(25) Lyles gave a statement to the Brigantine Police Department on the night of the Blake theft and was actually picked up at the police station by Plaintiff Bonds.

(26) Lyles admits Romonowski never conditioned her continued employment with Flagship on her taking a lie detector test.

(27) Bonds began working at the Flagship in 1997.

(28) Bonds' wife eventually came to work at Flagship.

(29) Bonds' wife left Flagship at his request.

(30) Bonds' wife never made any complaints to him about her employment at Flagship, except as to favoritism.

(31) Bonds described his claims of racial discrimination and/or harassment as comments about a black guy making a lot of money; when the theft occurred the only people who were interviewed were black people; the only people who were asked to take the polygraph were black; only black people were told their job was in jeopardy if they did not take the polygraph test.

(32) After about six months, Bonds was promoted to a Manager in Training.

(33) After thirty days, Bonds became a Team Leader.

(34) In October of 1999, Bonds was promoted to Referral Manager.

(35) Alter never made racial comments to Bonds.

(36) Bonds claims he told Alter once or twice about Love's racial comments but never followed up to see if Alter did anything about it.

(37) Bonds never made any written complaints about racial discrimination.



(38) Bonds took Lyles to the police station on the night of the Blake theft.

(39) Bonds now admits that all people interviewed by Romanowski were not black.

(40) Bonds claims that prior to the Blake theft, there were other "scams" perpetuated at Flagship because employees knew that Flagship had a de facto policy of reimbursing employees for theft claims.

(41) Bonds claims Alter, Love, Kaye, and Charles Tidwell ("Tidwell") all inquired if he would take a polygraph exam.

(42) Bonds claims Kaye ultimately told him "you don't have to take a lie detector test."

(43) Bonds claims Tidwell told him he was being fired by Kaye and Alter because he falsified his employment application.

(44) Gadson started working at Flagship in 1998.

(45) Gadson started as a booker.

(46) Gadson claims she had racial problems (2 incidents of favoritism shown toward whites) with Tidwell.

(47) Gadson was promoted from booker to fronter and then to team leader.

(48) Tidwell never uttered a racial slur to Gadson.

(49) Gadson claims Love told her she was making a lot of money for a black person following one of her promotions.

(50) Gadson complained to Alter about Love's comment. Alter met with Love and Love apologized to Gadson for the comment.

(51) Gadson claims Tidwell fired her and told her the reason was falsification of her application.

(52) Gadson claims Romonowski told her that if she was not willing to take a polygraph examination, she would no longer be working at the Flagship.

(53) Gadson claims Alter said similar words to her.

(54) George McGorkle ("McGorkle") was a telemarketer who started at Flagship in 1997.  McGorkle still works at Flagship and has both management and non-management positions. McGorkle has never, during his entire tenure at Flagship, experienced or felt or observed any different treatment toward himself as a black individual or towards other black individuals.

(55) Voetta Moore ("Moore") has worked at Flagship in excess of six years as a telemarketer. Moore never felt an environment at Flagship where blacks were treated differently from whites; even though she was black.

(56) Robin Davenport-Wyner ("Wyner") was employed at Flagship from February of 1997 through December of 1999 when she voluntarily left. Wyner was employed as a lead generator. Wyner was aware of Flagship's de facto policy of reimbursing employees for theft related complaints.

(57) James Massella ("Massella") has been employed with Flagship for over six years as a telemarketer and in other capacities. Massella has worked both in management and in a non-supervisory role. Massella replaced Bonds in his capacity following his termination.

(58) Derrick Collins ("Collins") has been employed at Flagship since 1997, starting out originally as a name generator and eventually being promoted to owner referrals. Collins has worked both in management and in a non-supervisory role. Collins confirms that Blake implicated both Bonds and Gadson in her theft.

(59) Sam McReynolds ("McReynolds") has been employed at Flagship since 1996. McReynolds has worked in both supervisory and non-supervisory roles.

(60) No reason was ever conveyed to employees of Flagship as to why Lyles, Bonds, or Gadson were terminated.

(61) Labooion Qwa Evans ("Evans") has been employed at Flagship since 1994 as a telemarketer. Evans never felt that black people nor did she ever see black people being treated differently due to their race.

(62) Jennifer Cade ("Cade") has been employed at Flagship for over five years as a telemarketer. Cade never observed any racially preferential treatment or racially discriminatory treatment.

(63) Karen Crump ("Crump") has been employed at Flagship since 1996 and has worked in both a supervisory and non-supervisory capacity. Crump confirms that the day after the theft, Gadson showed up at work with new boots and a new cell phone. Crump confirms no racially differential treatment at Flagship.

(64) Danielle Fletcher ("Fletcher") was employed at Flagship from January of 1998 through May of 2001 as a telemarketer.  Fletcher has never even heard a complaint from anybody about white people receiving preferential treatment from black people at Flagship.

(65) Allen Wooton ("Wooton") worked at Flagship from 1997 through early 2000, working his way through the ranks.  Wooton never noticed any racial problems at Flagship.

(66) Joelle Jackson ("Jackson") worked at Flagship from January of 1998 through April of 2001. Jackson had a dating relationship with Love. Jackson claims to have heard Love, Alter, and Tidwell refer to African Americans as "spesh".

(67) Charlotte Blake ("Blake") started at the Flagship in July of 1999. Blake worked as a data entry clerk with Lyles, who was her supervisor. Blake was the victim of a theft at Flagship on December 15, 1999 in excess of $4,000. Blake initiated a conversation with Romonowski and volunteered to

take a polygraph examination. Blake brought up the polygraph examination every time she met with Romonowski and he never initiated the subject.

(68) Jocelyn Earle ("Earle") has been employed by Flagship since March of 1996 in the capacity of a Company Trainer and Front Desk Supervisor. Earle confirms a de facto policy of Flagship in terms of reimbursing employees for thefts suffered by them. Earle confirms no preferential racial treatment. Earle confirms that other blacks, including herself, were promoted even after the termination of Lyles, Bonds, and Gadson.

(69) Dave Love was employed at Flagship from 1995 through 1996 and then from 1998 through March of 2001. In January of 2000, Love became Assistant Vice President of Marketing.

(70) All three plaintiffs worked in the Marketing Department.

(71) Love was terminated for dating an employee. Love was involved in the hiring of Lyles and Gadson, but not Bonds. Love confirms Flagship's policy of reimbursing employees who were the victims of theft while at work. Love claims Lyles was not given a reason for her termination.

(72) Romonowski was never in attendance at any Flagship meeting where Lyles, Bonds, or Gadson were discussed.

(73) Love never observed any incidents where black employees were treated differently than white employees.

(74) Howard Alter ("Alter") has been employed at Flagship since December of 1995. Alter is the Executive Vice President of Operations. Alter played no role in the hiring of the three plaintiffs.

(75) Charley Tidwell ("Tidwell") has been employed at Flagship since November of 1996. Tidwell eventually became the Assistant Vice President of Marketing.

(76) Tidwell confirms that Flagship did not have a policy that continued employment was conditioned upon an employee consenting to a polygraph examination.

(77) Susan Tunney ("Tunney") has been employed at Flagship since July of 1997.

(78) Flagship has never had any formal policy on requiring employees to take polygraph examinations.

(79) Whether employees are terminated for falsifying their application is a case-by-case decision at Flagship.

(80) Romonowski had free reign as it related to his investigation.

(81) The Marketing Department had a practice of reimbursing employees for thefts.

(82) Romonowski discussed the possibility of a polygraph examination with Tunney.

(83) Romonowski reported strong suspicions of the involvement of Lyles, Bonds, and Gadson in the Blake theft to Tunney.

(84) Romonowski did not indicate he was requesting polygraph examinations of any of the plaintiffs to Tunney.

(85) Romonowski conveyed facts to buttress his suspicions of Lyles, Bonds, and Gadson.

(86) Based upon Romonowski's information, Tunney made the recommendation to fire all three plaintiffs, which was ultimately accepted and agreed to by Kaye.

(87) All three plaintiffs were terminated based upon a belief that they were involved in the Blake theft.

(88) A secondary reason for the termination of Gadson was falsification of her application.

(89) Romonowski did not need approval from Tunney or Kaye before doing anything as it related to his investigation.

(90) Bruce Kaye ("Kaye") was the primary developer of the Flagship.  Kaye is President of Flagship. Kaye is Chairman of the Board of Directors of Flagship.

(91) Kaye was made aware from Alter that the company was reimbursing employees who were the victims of theft.

(92) Flagship had African Americans in management at higher levels than the three plaintiffs.

(93) Blake conveyed her suspicions of the three plaintiffs to Kaye during their first telephone call concerning the theft.

(94) Kaye called Romonowski to investigate the Blake theft.

(95) No instructions were given to Romonowski on how to conduct the investigation.

(96) No parameters were put on the investigation by Romonowski.

(97) Other than Blake, use of a polygraph as to any other employee was not discussed with Kaye.

(98) Kaye was involved in the decision-making process to terminate all three plaintiffs.

(99) All three plaintiffs were terminated due to the collective perception in the telemarketing office that they were involved in the Blake theft.

(100) Kaye was unaware that the three plaintiffs were allegedly requested to take polygraph examinations at the time he made the decision to terminate them.

(101) Kaye has never seen Romonowski's report.

(102) Romonowski knew he was hired and retained as "a subcontractor to investigate the theft, interview the victim, and whatever I felt I had to do to identify whether, if possible, identify the people involved."

(103) Romonowski was not asked and did not volunteer what techniques he would be employing in his investigation to Tunney or Kaye.

(104) Plaintiffs participated in a theft which resulted in the Flagship being the ultimate victim.

**B.    Defendants, Flagship Development Corp, et al, intend to prove the following contested facts with regard to damages:**

(1)  Assuming *arguendo* the alleged acts by defendants, any punitive damage award is unwarranted as the allegations do not prove either willful, deliberate or malicious conduct on the part of the defendants.

(2)  Plaintiffs sustained no damages of physical or mental nature which can be documented or substantiated.

(3)  Plaintiff did not suffer any financial and/or economic losses.

(4)  Plaintiffs failed to properly mitigate their damages.

(5)  Flagship sustained recognizable losses as a result of Plaintiffs theft.


**PART V.    WITNESSES AND SUMMARY OF LAY TESTIMONY**
        (Without limitation, the following is generally what these individuals may testify to at the time of trial.)


**A.    Plaintiff's Witnesses:**

(1)  Danielle Lyles will testify consistently with what has been set forth above.

(2)   Gloria Gadson will testify consistently with what
      has been set forth above.

(3)   Paulino Bonds will testify consistently with what
      has been set forth above.

(4)   Joelle Jackson, ex-employee of the defendant, will
      testify as to the treatment of minorities at the
      Flagship.

(5)   Fred Romonowski, the investigator, will testify as
      to the nature of his investigation; the
      utilization of the polygraph; Flagship's
      involvement in the investigation; and his
      conclusions based on the investigation.

(6)   Susan Tunney, defendant Human Resource Manager,
      will testify as to the operation of the Flagship;
      her involvement in the theft investigation; her
      involvement in the polygraph utilization; her
      conversation and dealings with Romonowski and Kaye
      regarding this investigation; discussions
      regarding the termination of the plaintiffs; and
      the effect the polygraph examination had on the
      decision to terminate the plaintiffs.

(7)   Michelle Zammit, Kaye's secretary, will testify
      that she did receive a copy of the Fred Romonowski
      report.

(8)   David Love, defendant employee, will provide
      testimony regarding his role in the theft
      investigation; meetings held in regard to the
      investigation; discussions he had regarding the
      theft; meetings held regarding the decision to
      terminate the plaintiffs; discussions regarding
      the ``company line'' regarding the reasons for the
      termination; and discussions regarding racial
      undertones in the office.

(9)   Howard Alter, VP at the Flagship, will testify, as
      otherwise set forth above, as to prior theft
      occurrences and the lack of any company policy
      regarding compensating theft victims.

(10)  Bruce Kaye, President and CEO of the Flagship,
      will testify as to the racial composition of his
      employees; reservations regarding Blake's story;
      his decision to terminate; how taking the
      polygraph would have been considered in his
      decision to terminate.

(11) Charlie Tidwell, employee of defendant, will provide information regarding prior thefts, and not being aware of reimbursing employees.

(12) James Massella, defendant employee, will provide information regarding prior thefts, and that he filled Bonds' position.

(13) Charlotte Blake, employee of the defendant; alleged theft victim; will provide information regarding the alleged theft; that Kaye advised her before the polygraphs that Romonowski was going to investigate using one; that Romonowski brought Kaye the results; that she was reimbursed by the Flagship for her alleged loss; Kaye called her to apologize, and to inform her that she had passed the polygraph; that she has a criminal conviction; that she lied on her application; and that she owed $4,000 in restitution, as a result of the aforementioned conviction, at the time of the alleged theft.

(14) Sharmarie Cobb, employee of the defendants, will testify that she works in Human Resources and that a lie detector would be used on employees if necessary.  She will also discuss general Flagship employment policies.

(15) George McCorkle, employee of the defendant, will testify as to the racial composition in management, and the terminations.

(16) Jennifer Cade, employee of the defendants, knew of prior thefts; had knowledge that polygraphs were being utilized to investigate the theft, and that people refused.

(17) Karen Crump, employee of the defendant, knew of Blake's money.

(18) Denise Bonds, wife of Paulino Bonds, will testify as to Mr. Bonds efforts to obtain comparable employment and the emotional impact of his wrongful termination.

(19) Plaintiffs reserve the right to call any of the witnesses identified above by Plaintiffs as well as any other individual whose name appears in discovery.

Plaintiffs reserve the right to call any of the witnesses identified below by Defendants as well as any other individual whose name appears in discovery.

**B.    Defendant's object to the following witnesses for
the reasons stated:**

Defendants object to witnesses Michelle Zammit and
Denise Bonds as neither have been identified previously
as having knowledge of information regarding this
Complaint. *If Zammit was not listed in the answers
to rags or Rule 26 disclosures, then D will be permitted to take*

**C.    Defendant's Witnesses:** *her deposition by Sept. 5, 03.*
*if Ms. Bonds was not listed in*

(1)  George McGorkle, employee of the defendant, will *answer to rags*
testify to her recollection of the events *or Rule 26*
underlying the Complaint consistent with his *disclosures, D*
Deposition Testimony. *will be permitted*
*to take her dep.*
*by 9/5/03.*

(2)  Voetta Moore, employee of the defendant, will
testify as to her recollection of the events *D reserves*
underlying the Complaint consistent with her *objection on*
Deposition Testimony. *duplicative*

(3)  Robin Davenport-Wyner, former employee of the *testimony*
Flagship, will testify as to her recollection of *grounds.*
the events underlying the Complaint consistent
with her Deposition Testimony.

(4)  James Massella, employee of the Flagship, will
testify as to his recollection of the events
underlying the Complaint consistent with his
Deposition Testimony.

(5)  Derrick Collins, employee of the Flagship, will
testify as to his recollection of the events
underlying the Complaint consistent with his
Deposition Testimony.

(6)  Sam McReynolds, employee of the Flagship, will
testify as to his recollection of the events
underlying the Complaint consistent with his
Deposition Testimony.

(7)  Labooin Qwa Evans, employee of the Flagship, will
testify as to her recollection of the events
underlying the Complaint consistent with her
Deposition Testimony.

(8)  Jennifer Cade, employee of the Flagship, will
testify as to her recollection of the events

underlying the Complaint consistent with her
Deposition Testimony.

(9)  Karen Crump, employee of the Flagship, will
     testify as to her recollection of the events
     underlying the Complaint consistent with her
     Statements and Deposition Testimony.

(10) Danielle Fletcher, former employee of the
     Flagship, will testify as to her recollection of
     the events underlying the Complaint consistent
     with her Deposition Testimony.

(11) Allen Wooton, former employee of the Flagship,
     will testify as to his recollection of the events
     underlying the Complaint consistent with his
     Deposition Testimony.

(12) Joelle Jackson, former employee of the Flagship,
     will testify as to her recollection of the events
     underlying the Complaint consistent with her
     Deposition Testimony.

(13) Charlotte Blake, employee of the Flagship, will
     testify as to her recollection of the events
     underlying the Complaint consistent with her
     Deposition Testimony and Statements.

(14) Jocelyn Earle, employee of the Flagship, will
     testify as to her recollection of the events
     underlying the Complaint consistent with her
     Deposition Testimony.

(15) Dave Love, former employee of the Flagship, will
     testify as to his recollection of the events
     underlying the Complaint consistent with his
     Deposition Testimony.

(16) Fred Romonowski, private investigator, will
     testify as to his recollection of the events
     underlying the Complaint consistent with his
     Deposition Testimony.

(17) Howard Aller, employee of the Flagship, will
     testify as to his recollection of the events
     underlying the Complaint consistent with his
     Deposition Testimony.

(18) Charles Tidwell, employee of the Flagship, will testify as to his recollection of the events underlying the      Complaint consistent with his Deposition Testimony.

(19) Suzanne Tunney, employee of the Flagship, will testify as to her recollection of the events underlying the Complaint consistent with her Statements and       Deposition Testimony.

(20) Bruce Kaye, President and Chairman of the Board of Directors of Flagship, will testify as to his re-collection of the events underlying the Complaint consistent with his Statements and Deposition Testimony.

(21) Michele Newhouse, employee of the Flagship, will testify as to her recollection of the events underlying the Complaint consistent with her Statement.

(22) Sarah Carroll, employee of the Flagship, will testify as to her recollection of the events underlying the Complaint consistent with her Statement.

(23) Jean Davis, employee of the Flagship, will testify as to her recollection of the events underlying the Complaint consistent with the Amended Answer to Interrogatories by Flagship.

(24) Sharmarie Cobb, employee of the Flagship, will testify as to her recollection of the events underlying the Complaint consistent with her Deposition Testimony.

(25) Defendants reserve the right to call any of the witnesses identified above by Plaintiffs as well as any other individuals whose name appears in discovery.

D.   **Plaintiff's object to the following witnesses for the reasons set forth:**

Plaintiffs object to witness Jean Davis for the reasons set forth in section IX (A)(1) of herein order.

(8)   Enlargements of graphs and charts prepared by Dr. Robert Wolf regarding the Plaintiffs, Bonds and Gadson.

(9)   Enlargements of various exhibits marked at the time of depositions.

(10)  Exhibit depicting the testimony of defendant Flagship's various management personnel and the stated reason for the termination of plaintiffs.

Plaintiffs specifically reserve the right to rely on any and all Exhibits used by defendants.

Plaintiffs specifically reserve the right to rely on and list as an Exhibit any and all documents filed with the United States District Court by defendants.

Plaintiffs specifically reserve the right to list other Exhibits for the purposes of impeachment should the need arise.

**Plaintiffs specifically reserve the right to utilize Exhibits marked through depositions.**

**B.    DEFENDANTS' EXHIBITS:**

(1)   Defendants intend to mark the following exhibits at trial, but may not seek to actually move all marked exhibits into evidence:

Flagship #1:    Deposition of James Massella
Flagship #2:    Deposition of Jennifer Leland
Flagship #3:    Deposition of Labooion Qwa Evans
Flagship #4:    Deposition of Sam McReynolds
Flagship #5:    Deposition of Derrek Collins
Flagship #6:    Deposition of David Love
Flagship #7:    Deposition of Charles Tidwell
Flagship #8:    Deposition of Joelle Jackson
Flagship #9:    Deposition of Jean Davis
Flagship #10:   Deposition of Allen J. Wooton
Flagship #11:   Deposition of Danielle Fletcher
Flagship #12:   Deposition of Howard Alter
Flagship #13:   Deposition of Susan Tunney
Flagship #14:   Deposition of Danielle S. Lyles
Flagship #15:   Deposition of Sharmarie Cobb
Flagship #16:   Deposition of Voetta Florence Moore

Flagship #17:   Deposition of Robin L. Davenport
Flagship #18:   Deposition of George McCorkle
Flagship #19:   Deposition of Paulino T. Bonds
Flagship #20:   Deposition of Charlotte Blake
Flagship #21:   Deposition of Bruce Kaye
Flagship #22:   Deposition of Gloria Gadson
Flagship #23:   Deposition of Fred Romonowki
Flagship #24:   Deposition of Jocelyn Earle
Flagship #25:   Flagship Resort Employment
                Application for Danielle Lyles
Flagship #26:   Flagship Resort Employee Advance
                Form for Danielle Lyles dated
                August 10, 1999
Flagship #27:   Flagship Resort Employee Advance
                Form for Danielle Lyles dated June
                28, 1999
Flagship #28:   Flagship Resort Employee Advance
                Form for Danielle Lyles dated
                December 7, 1998
Flagship #29:   Flagship Resort Employee Advance
                Form for Danielle Lyles dated
                November 7, 1999
Flagship #30:   Flagship Resort Employee Advance
                Form for Danielle Lyles dated
                September 21, 1999
Flagship #31:   Flagship Resort correspondence of
                Sharmarie Cobb dated January 31,
                2000
Flagship #32:   New Jersey Dept. of Labor forms
                for claimant,Danielle S. Lyles
Flagship #33:   Atlantic County Dept. of
                Administrative Services
                correspondence dated April 28,
                2000
Flagship #34:   Flagship Resort Employees Earning
                Payroll Register for Danielle
                Lyles
Flagship #35:   Flagship Resort Personnel Action
                Form for Danielle Lyles dated
                December 3, 1998
Flagship #36:   Flagship Resort Status Change
                noted for Danielle Lyles dated
                January 12, 2000
Flagship #37:   Flagship Resort Authorization for
                Danielle Lyles dated July 1, 1998

Flagship #38:     Flagship Resort Personnel Action
                  Form for Danielle Lyles dated July
                  1, 1998

Flagship #39:     Flagship Resort Personnel Action
                  Form for Danielle Lyles dated
                  August 31, 1998

Flagship #40:     Flagship Resort Personnel Action
                  Form for Danielle Lyles dated
                  December 3, 1998

Flagship #41:     Flagship Resort correspondence of
                  Howard Alter dated December 6,
                  1999

Flagship #42:     Correspondence of Carver Hall
                  Apts. dated November 15, 1999

Flagship #43:     City of Atlantic City – Bureau of
                  Public Welfare correspondence
                  dated July 24, 2000

Flagship #44:     Flagship Resort Payroll Status
                  Change Notice dated January 17,
                  2000 for Gloria Gadson

Flagship #45:     New Jersey Dept. of Labor,
                  Decision of the Appeal Tribunal in
                  the Matter of Gloria Gadson

Flagship #46:     New Jersey Dept. of Labor, Notice
                  of Determination in the Matter of
                  Gloria Gadson

Flagship #47:     Flagship Resort Development Corp.
                  Personnel Action Form for Gloria
                  Gadson dated May 20, 1998

Flagship #48:     Flagship Resort Authorization for
                  Gloria Gadson dated May 29, 1998

Flagship #49:     State of New Jersey – Dept. of
                  Labor Notice of Receipt in the
                  Matter of Gloria Gadson

Flagship #50:     Flagship Resort Employee Status
                  Change Notice for Gloria Gadson
                  dated September 14, 1999

Flagship #51:     Flagship Resort Employee Status
                  Change Notice for Gloria Gadson
                  dated February 15, 1999

Flagship #52:     Flagship Resort Employee Status
                  Change Notice for Gloria Gadson
                  dated February 12, 1999

Flagship #53:     Flagship Resort Personnel Action
                  Form for Gloria Gadson dated
                  January 11, 1999

Flagship #54:    Flagship Resort Personnel Action
                 Form for Gloria Gadson dated
                 November 17, 1998

Flagship #55:    Flagship Resort Payroll Status
                 Change Notice for Gloria Gadson
                 dated January 17, 2000

Flagship #56:    Flagship Resort Authorization for
                 Gloria Gadson dated December 6,
                 1999

Flagship #57:    Flagship Resort Authorization for
                 Gloria Gadson  dated October 5,
                 1999

Flagship #58:    Flagship Resort Authorization for
                 Gloria Gadson dated August 16,
                 1999

Flagship #59:    Flagship Resort Authorization for
                 Gloria Gadson dated June 20, 1999

Flagship #60:    Flagship Resort Authorization for
                 Gloria Gadson dated March 9, 1999

Flagship #61:    Flagship Resort Authorization for
                 Gloria Gadson  dated October 13,
                 1998

Flagship #62:    Flagship Resort Report Employees -
                 Status Change Notice for Gloria
                 Gadson dated April 12, 1999

Flagship #63:    Flagship Resort correspondence of
                 David Love dated July 17, 2000

Flagship #64:    Flagship Resort Employment
                 Application for Gloria Gadson
                 dated May 18, 1998

Flagship #65:    Flagship Resort Employee Earnings
                 Payroll Register for Gloria Gadson

Flagship #66:    Flagship Resort Authorization for
                 Paulino Bonds dated November 27,
                 1999

Flagship #67:    Flagship Resort Authorization for
                 Paulino Bonds dated November 1,
                 1999

Flagship #68:    Flagship Resort Authorization for
                 Paulino Bonds dated August 30,
                 1999

Flagship #69:    Flagship Resort Authorization for
                 Paulino Bonds dated June 20, 1999

Flagship #70:    Handwritten notation regarding
                 advances of Paulino Bonds

Flagship #71:   New Jersey Dept. of Labor, Notice
of Determination in the Matter of
Paulino Bonds

Flagship #72:   Flagship Resort correspondence of
Paulino Bonds dated June 2, 1999

Flagship #73:   Correspondence of Derrik J.
Collins dated September 1, 1999

Flagship #74:   New Jersey Dept. of Labor
Determination in the Matter of
Paulino T. Bonds

Flagship #75:   Flagship Resort Payroll Status
Change Notice in regard to Paulino
Bonds dated October 21, 1999

Flagship #76:   Flagship Resort Personnel Action
Form in regard to Paulino Bonds
dated November 4, 1997

Flagship #77:   Flagship Resort Personnel Action
Form in regard to Paulino Bonds
dated June 16, 1997

Flagship #78:   Flagship Resort Personnel Action
Form in regard to Paulino Bonds
dated June 23, 1997

Flagship #79:   Flagship Resort Authorization for
Paulino Bonds dated June 11, 1998

Flagship #80:   Flagship Resort Vacation Request &
Approval for Paulino Bonds

Flagship #81:   Flagship Resort Employee Update
for Paulino Bonds

Flagship #82:   Flagship Resort Job Description
Acceptance of Paulino Bonds dated
June 16, 1997

Flagship #83:   Flagship Resort Authorization for
Paulino Bonds dated June 16, 19978

Flagship #84:   Flagship Resort Payroll Status
Change Notice for Paulino Bonds
dated January 17, 2000

Flagship #85:   Atlantic County Dept. of Family
and Community Development
Application for Paulino Bonds
dated June 22, 2000

Flagship #86:   Atlantic Palace Personnel Action
Form for Paulino Bonds dated June
11, 1998

Flagship #87:   Flagship Resort Employee
Information for Paulino Bonds

Flagship #88:   Correspondence of Howard Alter in regard to Paulino Bonds dated December 1, 1997

Flagship #89:   Personnel file of Danielle Lyles from Harrah's Entertainment, Inc. and Showboat

Flagship #90:   Personnel file of Danielle Lyles from New Jersey Federal Credit Union

Flagship #91:   Application for Employment with the City of Atlantic City for Danielle Lyles

Flagship #92:   South Jersey Federal Credit Union Report for Danielle Lyles

Flagship #93:   Request for Admissions of Danielle Lyles

Flagship #94:   Personnel file of Caesar's Atlantic City for Paulino Bonds

Flagship #95:   Personnel file of Danielle Lyles from Vineland Check Cashing

Flagship #96:   Personnel file for Paulino Bonds from Trump Plaza Hotel & Casino

Flagship #97:   Statement of Paulino Bonds on December 16, 1999

Flagship #98:   Statement of Gloria Gadson on December 16, 1999

Flagship #99:   Statement of Gloria Gadson on December 21, 1999

Flagship #100:  Interrogatory answers of plaintiff Gloria Gadson

Flagship #101:  Statement of Karen Crump on December 21, 1999

Flagship #102:  Statement of Michelle Newhouse on December 16,1999

Flagship #103:  Statement of Sarah Carroll on December 21, 1999

Flagship #104:  Statement of Charlotte Blake on December 16, 1999

Flagship #105:  Statement of Charlotte Blake on December 16, 1999

Flagship #106:  Fred Romonowski Investigation, original file

Flagship #107:  Judgment of Conviction for Gloria Gadson

Flagship #108:  Photograph of Flagship Resort offices

Flagship #109: Personnel file of Danielle Lyles
for Showboat Casino & Hotel
Flagship #110: Telephone records for Flagship,
Tel. No. 266-7400
Flagship #111: Defendants' Answers to
Interrogatories directed to all
Flagship #112: Plaintiff Gloria Gadson's Answers
to Interrogatories
Flagship #113: Plaintiff Paulino Bonds' Answers
to Interrogatories
Flagship #114: Plaintiff Danielle Lyle's Answers
to Interrogatories
Flagship #115: All documents identified as
Exhibits in Depositions conducted
in this matter
Flagship #116: Deposition of Jennifer Cade

Defendants specifically reserve the right to rely on any and all Exhibits used by plaintiffs.

Defendants specifically reserve the right to rely on and list as an Exhibit any and all documents filed with the United States District Court by plaintiffs.

Defendants specifically reserve the right to list other Exhibits for the purposes of impeachment should the need arise.

PART VIII.     LAW

A.     Plaintiff's Legal Issues:

(1)   Violation of the Employee Polygraph Protection
Act of 1988; 29 U.S.C. §2001 et. seq
(2)   Wrongful termination pursuant to New Jersey law
for violation of the clear mandate of public
policy;
(3)   Violation of New Jersey's law prohibiting
utilization of the polygraph in the work place;
N.J.S. 2C:40A-1;
(4)   violation of New Jersey's Law Against
Discrimination N.J.S. 10:5-1 et seq.; and
(5)   Any and all damages provided for under Federal or
State law for violations of the above, including,
but not limited to compensatory damages, punitive
damages, costs and attorney fees.

B.   **Defendant's Legal Issues:**

(1)   Did the defendants engage in conduct which constituted either racial harassment or racial discrimination under New Jersey and/or Federal Law?

(2)   Did defendant supervisors engage in conduct which created a "hostile work environment" for the Plaintiffs?

(3)   Did defendants facilitate harassing conduct by delegating to supervisors control over "the day-to-day working environment"?

(4)   Was the Plaintiff's working environment at the Flagship either "hostile" or "abusive"?

(5)   Assuming *arguendo* the allegations of plaintiffs, was the discrimination "pervasive" or "severe"?

(6)   Assuming *arguendo* the allegations of plaintiffs, did the discrimination "detrimentally affect" the plaintiffs?

(7)   Assuming *arguendo* the allegations of plaintiffs, did the plaintiff's identify behavior that was unwelcome?

(8)   Assuming *arguendo* the allegations of plaintiffs, did the harassment affect a "term, condition, or privilege" of plaintiffs employment at the Flagship?

(9)   Are any of the issues regarding liability of defendant, Flagship Development Corp., Inc., issues of liability which defendant would be vicariously liable for under the doctrine of Respondeat Superior?

(10)  If Plaintiffs are alleging racial discrimination by defendant Flagship can they pursuant to New Jersey law demonstrate a *prima facie* case of discrimination?

(11) If all of the above are proved by plaintiffs, have the plaintiffs proved that the defendants actions were either "especially egregious"," evil-minded acts", or a "willful or wanton disregard of the rights of another" to warrant punitive damages?

(12) Did defendants comply with subsection 29 U.S.C. § 2006(d)(1) in regard to the polygraph examinations?

13) Did defendants violate the Employee Polygraph Protection Act of 1988; 29 U.S.C. § 2001 *et. seq.* and did Plaintiff's proximately suffer any damages thereby?

(14) Did defendants violate the New Jersey law prohibiting utilization of the polygraph and violate public policy pursuant to N.J.S.A. 2C:40A-1; and did Plaintiff's proximately suffer any damages thereby?

(15) Did Flagship sustain damages as victim of theft to which any of the plaintiffs are responsible?


PART IX.  **MISCELLANEOUS**

A.   **PLAINTIFFS:**

(1) *Motion in Limine* to exclude the testimony or reference to information regarding the alleged theft that is in the possession of Jean Davis, who was an employee of the defendant Flagship, as not being relevant, as being highly-prejudicial, and not being provided in a timely fashion pursuant to the Rules of Discovery/Case Management Order. Specifically, admissions allegedly made by the plaintiffs.

(2) *Motion in Limine* excluding the statement provided to the Flagship management from Sarah Carol, an ex-employee of the Flagship, regarding the theft as not being relevant, highly prejudicial and as not falling within an exception to the hearsay rule.

(3)   *Motion in Limine* regarding any reference to
      evidence the defendants may claim they had at the
      time of the termination regarding the theft
      because this information is not relevant, highly
      prejudicial, and either hearsay or
      unsubstantiated.  Reference to the evidence
      regarding the alleged theft would be an attempt
      by the defense to make this trial a theft issue
      trial, rather than a violation of the applicable
      polygraph laws.

(4)   *Motion in Limine* barring any reference or
      argument that employee loans made to the
      plaintiff, Lyles, as being motivation to steal.

(5)   *Motion in Limine* barring any reference or raising
      the defense that Flagship falls into an exception
      permitting it to utilize the polygraph in this
      matter.  The Flagship cannot avail itself of the
      exception because, among other things, they may
      not utilize the polygraph to establish that a
      theft was committed; they did not follow testing
      procedures; and it is their business that must
      have suffered the loss, and not an employee. *See*
      29 U.S.C.A. 2006; 29 C.F.R. 801.12; and Lyle v.
      Mercy Hospital Anderson, 876 F.Supp. 157
      (S.D.Ohio 1995).

(6)   *Motion in Limine* barring the defendant's counter-
      claims for conspiracy, unjust enrichment, and
      conversion because it lacks the proofs and lacks
      standing.  The alleged theft victim in this
      matter was Blake, and not the Flagship.

(7)   *Motion in Limine* barring any reference to there
      being a company policy or procedure whereby theft
      victims were reimbursed by management because not
      one defendant employee could substantiate such a
      policy, even Bruce Kaye, the President and CEO.

(8)   *Motion in Limine* barring any reference to any
      prior or subsequent criminal convictions of any
      plaintiff as being the stated reason provided for
      termination because such information is unduly
      prejudicial, and otherwise irrelevant and
      inadmissible.

Plaintiffs reserve the right to re-assert any of their Summary Judgment arguments again at any time before or during the Trial.

Since Plaintiffs will not get to make further changes to this Joint Final Pre-Trial Order, they reserve the right to object to any further additions or if additions are allowed to respond accordingly.

**B.    DEFENDANTS:**

(1)   Defendants will oppose all seven *Motions in Limine* and believe Plaintiffs may be collaterally estopped from raising same.

(2)   Defendants will raise a *Motion in Limine* preventing any of the Plaintiffs from attempting to use the polygraph of Charlotte Blake to attempt to prove their case against Defendants. Plaintiffs lack standing to use the polygraph.

Defendants reserve the right to re-assert any of their Summary Judgment arguments again at any time before or during the Trial.

Since Defendants will not get to make further changes to this Joint Final Pre-Trial Order after Plaintiffs make their further changes, they reserve the right to object to any further additions or if additions are allowed to respond accordingly.

## CONCLUDING CERTIFICATION

We hereby certify by affixing our signature to this Final
Pretrial Order that it reflects the efforts of all counsel
and that we have carefully and completely reviewed all
parts of this order prior to its submission to the Court.
Further, it is acknowledged that amendments to this
Pretrial Order will not be permitted except where the Court
determines that manifest injustice would result if the
amendment is not allowed.

GOLDENBERG, MACKLER, SAYEGH,
 MINTZ, PFEFFER, BONCHI & GILL

_____
JAMES P. GRIMLEY, ESQUIRE
Attorney for Pltf. Lyles
Gadson

YOUNGBLOOD, CORCORAN, LAFFERTY,
 STACKHOUSE, HYBERG & WALDMAN

_____
RANDOLPH C. LAFFERTY, ESQUIRE
Attorney for Pltf, Bonds &

JACOBS & BARBONE, P.A.

_____
LOUIS M. BARBONE, ESQUIRE
Attorney for Defendant Flagship
Development Corp., Inc.

JASINSKI & WILLIAMS, P.C.

_____
KAREN M. WILLIAMS, ESQUIRE
Co-Counsel for Defendant Flagship
Development Corp., Inc.

        Entry of the foregoing Joint Final Pretrial Order is
hereby approved this __30__ day of __July__ , 2003.

_____
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

① Counsel anticipate 3-week trial.