UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DANIELLE LYLES, et al.,

      Plaintiffs,

   v.

FLAGSHIP RESORT DEVELOPMENT
CORPORATION,

      Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 01-6118(JEI)

**OPINION**

**APPEARANCES:**

GOLDENBERG, MACKLER, SAYEGH, MINTZ, PFEFFER,
BONCHI & GILL
By: Mark Pfeffer, Esq.
1030 Atlantic Avenue
Atlantic City, New Jersey 08041
    Counsel for Plaintiff Lyles

YOUNGBLOOD, CORCORAN, LAFFERTY, HYBERG & WALDMAN, P.A.
By: Randolph C. Lafferty, Esq.
3205 Fire Road, P.O. Box 850
Pleasantville, New Jersey 08232
    Counsel for Plaintiffs Bonds and Gadson

JACOBS & BARBONE, P.A.
By: Louis M. Barbone, Esq.
1125 Pacific Avenue
Atlantic City, New Jersey 08041
    Trial Counsel for Defendant

JASINSKI & WILLIAMS, P.C.
By: Karen Williams, Esq.
Old Guaranty Trust Building
1125 Atlantic Avenue, Suite 617
Atlantic City, New Jersey 08401
    Trial Counsel for Defendant

SCHNADER HARRISON SEGAL & LEWIS
By: Arlin Adams, Esq.
Nancy Winkelman, Esq.
Bruce P. Merenstein, Esq.
Harris Neal Feldman, Esq.
1600 Market Street, Suite 3600
Philadelphia, PA 19103
    Post-Trial Counsel for Defendant

RICHARD AND RICHARD, P.A.
By: Dennis Richard, Esq.
825 Brickell Bay Drive, Suite 1748
Miami, FL 33131
    Post-Trial Counsel for Defendant


**IRENAS**, Senior District Court Judge:

    Following a two-week trial, the jury returned a verdict on
June 10, 2004, for Plaintiffs Danielle Lyles ("Lyles"), Gloria
Gadson ("Gadson"), and Paulino Bonds ("Bonds") (collectively
"Plaintiffs") in a consolidated action against Defendant Flagship
Development Corporation ("Flagship").  The jury found that
Flagship violated the Employee Polygraph Protection Act of 1988
("EPPA") in asking Plaintiffs to take polygraph examinations and
in firing them based on the results of a polygraph administered
to another employee.  The jury awarded Plaintiffs approximately
four million dollars in lost wages, damages for emotional
distress, and punitive damages.  Presently before the Court is
Flagship's motion for post-judgment relief.  For the reasons set
forth within, the Court will grant Flagship's request for a new
trial.

I.

Given the volume of information presented at the trial, the Court will provide a short summary of the facts presented to and accepted by the jury in reaching their verdict.  Until their terminations, Plaintiffs were employees at the Brigantine facility of Flagship, a company in the business of selling timeshares in Atlantic City, New Jersey.  Lyles was hired as a part-time data entry clerk in July, 1998.  She later became a full-time clerk and was eventually promoted to Data Entry Manager.  Bonds began working at Flagship in June, 1997, as a telemarketer, and after a series of promotions was given the position of Referral Manager in October, 1999.  Gadson was hired as a booker at Flagship in April, 1998, and was eventually promoted to the positions of fronter and team leader.

Plaintiffs were fired as a result of events arising from a theft at the Brigantine facility on December 15, 1999.  Charlotte Blake ("Blake"), a co-worker of Lyles, reported that $4,100 had been stolen out of her desk drawer.  Blake and Lyles went to the Brigantine Police Department and gave statements to the police about the theft.  Blake also notified Flagship President and CEO Bruce Kaye ("Kaye"), and implicated Plaintiffs in the theft. Kaye hired a private investigator, Fred Romanowski ("Romanowksi"), to investigate the incident.

Romanowski interviewed a number of Flagship employees,

3

including Blake and Plaintiffs.  Romanowski requested and
received authorization from Flagship to ask Blake to take a
polygraph examination, as there were doubts about the veracity of
her allegations.  Blake agreed to the take the test and
subsequently "passed" the examination.  Romanowksi, without
authorization, also asked Plaintiffs to submit to polygraph
examinations.  Flagship was made aware of his requests to
Plaintiffs after the fact.  Several Flagship managers later asked
or encouraged Plaintiffs to take the tests.  Plaintiffs refused
to take polygraph examinations.

Lyles was fired on January 12, 2000, and Bonds and Gadson
were fired the following day.  The termination of all three
Plaintiffs was ordered by Kaye.  Bonds and Gadson were told that
they were fired for lying on their employment applications.

Plaintiffs also alleged that Flagship had discriminated
against them based on their race in violation of New Jersey's Law
Against Discrimination ("LAD"), but voluntarily dismissed their
LAD claims on May 27, 2004, at the end of the presentation of
their case but before Flagship had presented any evidence.  The
jury therefore did not deliberate or reach a verdict on the LAD
claims.

Plaintiffs filed post-judgment motions seeking attorneys'
fees and costs, prejudgment interest and an allocation of the
punitive damages.  Flagship filed a post-trial motion seeking

judgment as a matter of law in its favor, a new trial, or in the alternative, remittitur.  Briefing on these motions was postponed until after receipt of the trial transcripts, and was completed in February, 2005.  Both parties filed oppositions to the other's motions.  A ruling on the issues raised by Flagship could render moot Plaintiffs' requests, therefore, the Court has first addressed Flagship's motion.

II.

Flagship maintains that it is entitled to a judgment as a matter of law because prior to Plaintiffs' dropping their LAD claim, Plaintiffs argued that Flagship used the polygraph examination as a pretext for firing them based on their race, and as a result, they should be bound by their claim that the true motive for Plaintiffs' firing was something other than the polygraph examination.  Additionally, Flagship contends that Plaintiffs did not have standing to assert an EPPA claim based on the test administered to Blake, and the remaining evidence is insufficient to establish that Flagship fired Plaintiffs with knowledge that they had been asked to take polygraph examinations by the investigator.

A trial court should grant a judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and

reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  The court is not permitted to weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for that of the jury, in determining whether the evidence is sufficient to sustain the verdict.  *Id.*  "The motion may be granted if 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Boehringer Ingelheim Vetmedica, Inc., v. Schering-Plough Corp.*, 166 F. Supp. 2d 19, 28 (D.N.J. 2001).

The evidence presented by Plaintiffs provides a reasonable basis for a jury verdict in their favor on their claim that they were fired based on their refusal to take polygraph examinations and the results of the test illegally administered to Blake. Plaintiffs testified that they were initially asked to take polygraph examinations by Romanowski, and later by Flagship managers who suggested that Plaintiffs could save their jobs by taking the tests.  Bonds testified that he was told by Kaye that he was fired for refusing to take a polygraph examination and the false charge of lying on his employment application.

Testimony by Flagship managers who took part in the decision to terminate Plaintiffs also provides a basis upon which the jury could hold Flagship liable.  Kaye testified that he authorized the test administered to Blake and relied on the results in

6

determining the credibility of Blake's description of the theft and allegations against Plaintiffs. Susan Tunney, the Human Resources Manager, testified that the results of Blake's test were a substantial factor in the decision to terminate Plaintiffs. She also testified that Plaintiffs' refusal to take polygraph examinations was looked upon negatively by Flagship management.

Moreover, Flagship's assertion that Plaintiffs lack standing to bring a claim under EPPA based in part on the polygraph examination administered to another employee lacks merit. EPPA provides that "it shall be unlawful for any employer. . . (3) to discharge. . . (B) any employee or prospective employee on the basis of *any* lie detector test." 29 U.S.C. § 2002(3)(B)(1988) (emphasis added). The use of the phrase "any lie detector test" in this provision clearly prohibits employer action against an employee based on a test administered to that employee or another person. Plaintiffs here are "the employee[s] . . . affected" by Flagship's violation of § 2002(3)(B).


III.

Alternatively, Flagship seeks a new trial, arguing that the jury was inflamed by Plaintiffs' unrebutted and inadmissible evidence of racial discrimination, and also that this Court erred in refusing to admit several items of evidence offered by Flagship. Flagship also contends that the jury should have been

7

instructed to consider whether Plaintiffs would have been fired regardless of the polygraph examinations.  The Court concludes that Flagship is entitled to a new trial because it was unfairly prejudiced by the evidence of racial discrimination offered by Plaintiffs before they dropped their LAD claims, and also on the additional ground that the damages awarded by the jury are grossly excessive.[1]

Federal Rule of Civil Procedure 59 governs the grant of a new trial in an action where there has been a trial before a jury.  The rule provides that a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a).  Generally, a trial court should grant a motion for a new trial when "in the opinion of the trial court, the verdict is contrary to the great weight of the evidence, thus making a new trial necessary to prevent a miscarriage of justice."  *Roebuck v. Drexel University*, 852 F.2d 715, 736 (3d Cir. 1988)(citing 9 Charles Wright & Arthur Miller, *Federal Practice & Procedure* § 2531 at 575-76 (1971)(noting that the standard for granting a new trial is substantially less demanding than that for a judgment as a matter of law)).

A trial court is vested with wide discretion in ruling on a

---

[1] The remaining issues related to the exclusion of evidence and the jury instructions will be addressed at the appropriate time during trial should they arise again.

motion for a new trial.  9 Wright & Miller § 2531 at 575; *see also Lightning Lube, Inc., v. Witco Corp.*, 802 F. Supp. 1180, 1185 (D.N.J. 1992).  Unlike with a motion for judgment as a matter of law, the court is allowed to consider the credibility of witnesses and weigh the evidence.  *Id.*  "The district court's discretion, of course, is not unbounded.  Particularly where the court has replaced its opinion for that of the jury, we must be careful that plaintiff's right to a jury trial is not usurped." *Roebuck*, 852 F.2d at 735.  A trial court may not grant a new trial because it would have come to a different conclusion than that reached by the jury.  *Lightning Lube*, 802 F. Supp. at 1186.

Several circumstances have been recognized as general grounds for granting a new trial:  "'the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions."  *Id.* (quoting *Northeast Women's Center, Inc., v. McMonagle*, 689 F. Supp. 465 (E.D. Pa. 1988), *aff'd in relevant part* 868 F.2d 1342 (3d Cir. 1989)).

A.

When a party seeks a new trial on the grounds that the jury was influenced by inadmissible evidence, the trial judge must grant a new trial "unless it was 'highly probable' that the error

9

did not affect any 'substantial rights.'" *Bhaya v. Westinghouse Electric Corp.*, 922 F.2d 184, 189 (3d Cir. 1990)(quoting *McQueeny v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985)); *see also* Fed. R. Civ. P. 61 (errors in the admission of evidence are grounds for a new trial only where "refusal to take such action appears to the court inconsistent with substantial justice").

Flagship argues that the jury was inflamed by Plaintiffs' evidence of racial discrimination, which was later rendered inadmissible when Plaintiffs' dropped their LAD claims.  Flagship contends that the testimony on racial discrimination was extensive and spread throughout the presentation of Plaintiffs' case, but it was unable to rebut this evidence because Plaintiffs' dropped their claims shortly before resting their case.  Flagship maintains that the evidence of racial discrimination affected the outcome of the trial, warranting a new trial as no instruction to the jury could have cured this "poisoning."

The Third Circuit addressed a similar argument in *Bhaya*, where it sustained the district court's grant of a new trial after an out-of-court statement by an unnamed company official suggesting a willingness to break unspecified labor laws was admitted in an age discrimination case.  The Court held that the statement had little probative value or relevance to the plaintiffs' ADEA claim, as the lawlessness suggested by the statement had little connection to the issue of age

10

discrimination.  922 F.2d at 187-88.  The Court noted that
"[e]vidence that a party committed wrongs other than those at
issue in a case often creates a danger of 'unfair prejudice'
because such evidence may influence a jury to return a verdict
based on a desire to punish for the other wrongs."  *Id.* at 188.

Here the evidence of racial discrimination, later rendered
inadmissible by the Plaintiffs' own actions, was significantly
more extensive than the statement the Third Circuit found unduly
prejudicial in *Bhaya*.  Plaintiffs presented testimony alleging
that Flagship management mocked and derided African-American
employees, denigrating their intelligence and personal hygiene
habits.  Plaintiffs argued that they were asked to take polygraph
examinations and were fired because they are African-American.
Plaintiffs offered evidence that African-Americans were treated
poorly in comparison to white employees, with greater
restrictions put on African-American employees and greater
opportunities offered to white employees.  Plaintiffs also
alleged that Flagship promoted African-Americans to managerial
positions while the litigation was pending in order to cover up
its past discrimination.  This evidence stood unrebutted when the
jury began its deliberations.

Plaintiffs do not contest that this evidence became
inadmissable when they dropped their LAD claims, nor do they
argue that the evidence was not prejudicial.  Plaintiffs argue
instead that Flagship waived any right it may have had to a new

11

trial because it did not seek a mistrial during the trial.  The law of the Third Circuit, however, is that a party must *object* at trial in order to preserve the right to complain post-trial.  *See Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998); *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979); *Boehringer*, 166 F. Supp. 2d at 40.  Flagship is not required to have requested a mistrial; its contemporaneous objection was sufficient to preserve its right to seek a new trial.

Plaintiffs also attempt to distinguish a Seventh Circuit case relied on by Flagship, *Shick v. Illinois Dept. of Human Services*, 307 F.3d 605 (7th Cir. 2002).  In *Shick*, the jury found for the plaintiff on his disability and sex discrimination claims, awarding him five million dollars.  After trial, however, the trial court vacated the ADA verdict in light of the Seventh Circuit's holding that the ADA is not a valid abrogation of states' Eleventh Amendment rights.[2]  The defendant subsequently sought a new trial on the Title VII claim alone, arguing that the jury was prejudiced by the now-inadmissible disability discrimination evidence.  The trial court denied the defendant's request, and the circuit reversed.

The Seventh Circuit held that "the steep verdict demonstrates the extraordinary impact of the disability

---

[2]*See Erickson v. Board of Governors*, 207 F.3d 945 (7th Cir. 2000); *see also Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001).

discrimination evidence, because while it is clear that

[plaintiff] and [plaintiff's supervisor] had an acrimonious

relationship (to say the least), the hostilities were primarily

caused by [the supervisor's] callous attitude about [plaintiff's]

several disabilities – not his gender."  307 F.3d at 612.  *Shick*

characterized the plaintiffs' evidence of disability

discrimination as "overwhelming" while noting that the evidence

of sex discrimination was "limited."  *Id.* at 614.

Although there are differences between *Shick* and the instant

case, Plaintiffs' attempts to distinguish *Shick* are unsuccessful.

In contrast to the extensive evidence of disability

discrimination in *Shick* later rendered inadmissible by the

Seventh Circuit's ruling on the Eleventh Amendment issue, in this

case Plaintiffs felt that their evidence of racial discrimination

was insufficient to justify a verdict in their favor, and chose

to go to the jury with only their stronger EPPA claim.  This

distinction, however, does not lessen the impact of the racial

discrimination evidence that Plaintiffs presented in this case.

Nor was their evidence of discrimination so weak as to render

inapplicable *Shick*'s observation that an unusually steep verdict

reflects the impact of such evidence.[3]

Plaintiffs' also suggest that they voluntarily withdrew

_____

[3]Indeed, this Court observed that it would not have directed
a verdict for Flagship on the LAD claim until after it heard
Flagship's rebuttal evidence.  (Tr. 656.)

13

their LAD claim "relatively early on in the trial testimony before much of the evidence was submitted concerning that claim," whereas in *Shick* the judgment was vacated after trial at the trial court's discretion. (Pl. Br. at 4.) The record belies their suggestion, as they withdrew their claim shortly before resting their case and after significant testimony had been offered. If anything, their argument suggests to this Court that a new trial is more appropriate in this instance than in *Shick*, as the defendant there had the opportunity to rebut the inadmissible evidence while Flagship here did not.

Plaintiffs contend that the prejudicial effect of the racial discrimination evidence was ameliorated by this Court's instruction to the jury that it "must not consider [the racial discrimination] claims or any evidence relating solely to them in resolving the issues you have been asked to decide." (Tr. 1310, 1430.) They also maintain that the effect was limited by the ability of defense counsel to argue that the LAD claim had been withdrawn. The size of the verdict in this case strongly suggests that these admonitions were not enough to counter the taint of the racial discrimination evidence.

This Court cannot conclude that it was highly probable that the inadmissible evidence of racial discrimination *did not* affect Flagship's substantial rights. *See Bhaya*, 922 F.2d at 189. The evidence of Flagship's derision of and discrimination against its African-American employees, while perhaps not enough for recovery

14

under LAD, was enough to create unfair prejudice against Flagship and influence the jury to "return a verdict based on a desire to punish for other wrongs."  *Id.* at 188.  The four million dollar verdict demonstrates the extent of the evidence's improper influence on the jury.

B.

The size of the verdict also raises significant questions about the fairness of trial independent from the impact of the racial discrimination evidence.  When a defendant claims that a jury's award of damages is excessive, "[a] new trial is warranted only where the verdict is grossly excessive and bears no rational connection to the evidence."  *Blakely v. Continental Airlines*, 992 F. Supp. 731, 734 (D.N.J. 1998)(citing *Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 773 (3d Cir. 1987)).  "For the court to disturb a jury verdict, 'the damages assessed by the jury must be so unreasonable as to offend the conscience of the Court.'" *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)(citation omitted).  If the trial court finds that the verdict is a result of passion or prejudice by the jury, the court must grant a new trial.  *Dunn v. HOVIC*, 1 F.3d 1362, 1367 (3d Cir. 1993); *Blakely*, 992 F. Supp. at 735.  The court's obligation, however, "is to uphold the jury's award if there exists a reasonable basis to do so."  *Motter*, 883 F.2d at 1230.

15

The jury awarded Plaintiffs a total of $4,076,445, including $2,980,000 in punitive damages.  Gadson was awarded $145,120 in lost wages and $300,000 in non-economic damages.  Bonds was awarded $263,040 in lost wages and $200,000 in non-economic damages.  Lyles was awarded $88,285 in lost wages and $100,000 in non-economic damages.

It is often a helpful guide to a court to examine the awards given in other cases with similar injuries.  *Motter*, 883 F.2d at 1230.  There have been very few reported verdicts in EPPA cases, although in the four this Court could locate the awards were significantly lower than the jury verdict in the instant matter.  *See Dilworth v. Lasalle-Chicago 24-Hour Currency Exchange, Inc.,* No. 02-C-7543, 2004 WL 524665 (N.D. Ill. March 12, 2004)(jury awarded plaintiff $6,000); *Albin v. Cosmetics Plus, N.Y., Ltd.*, No. 97 Civ. 2670, 2001 WL 15676 (S.D.N.Y. Jan. 5, 2001)(jury awarded plaintiff $75,000 in lost wages and $5,000 for emotional distress; court upheld award and granted plaintiff's request for prejudgment interest on the lost wages award, calculated at a 6% rate); *Mennen v. Easter Stores*, 951 F. Supp. 838 (N.D. Ia. 1997)(court awarded plaintiff $18,225.35 in lost wages, $4,098.22 in prejudgment interest on lost wages award, and $15,000 for emotional distress); *Jones v. Confidential Investigative Consultants, Inc.*, No. 92-C-1566, 1994 WL 127261 (N.D. Ill. April 12, 1994)(jury awarded plaintiff $90,000; court declared judgment to be void because it was obtained in violation of Bankruptcy

16

Code's automatic stay).

In light of these relatively modest awards in other EPPA cases, the jury's award here shocks the conscience.  Should the Court accept the proposition of Lyles that the punitive damages be distributed equally between the three plaintiffs, each plaintiff stands to recover well over $1,000,000.  (July 13, 2004, Ltr. Br. from M. Pfeffer, Counsel to Lyles.)  If the Court divides the punitive damages based on the percentages proposed by Bonds and Gadson, Lyles would be due the smallest portion of the punitive damages and yet her total recovery would be almost $700,000.  (Bonds/Gadson Br. in Support of Mot. for Post-Judgment Relief, at 1.)

In either instance, the awards received by these Plaintiffs so far exceed the ordinary award for a violation of EPPA that it appears the jury "abandon[ed] analysis for sympathy for a suffering plaintiff and treat[ed] an injury as though it were a winning lottery ticket." *Gumbs*, 823 F.2d at 773.  The only significant difference between the facts of the instant case and the other reported EPPA cases is the additional inadmissible evidence of racial discrimination in this case.

An examination of the awards for emotional distress in this case is particularly illustrative of the lack of a reasonable evidential basis for the jury's large verdict.  *Mennen* is the only reported EPPA decision to discuss damages for emotional distress in detail.  The court found that the plaintiff suffered

17

humiliation and embarrassment over his demotion from grocery store manager to stocker, a position he held thirteen years earlier as a high school student. 951 F. Supp. at 865. The plaintiff became depressed and began seeing a counselor. *Id.* The counselor testified that the plaintiff exhibited "irritability, low mood, and generalized anxiety" and had "sleep disturbances and experienced trouble maintaining his weight." *Id.* at 865 n.30. The counselor diagnosed the plaintiff as suffering from anxiety, and noted that he "experienced general frustration, anxiousness, and deficiencies in concentration." *Id.* The plaintiff's family members and co-workers testified that he became depressed, sad, quiet and withdrawn. *Id.* at 865-66. Based on this evidence, the Northern District of Iowa determined that the plaintiff was entitled to $15,000 in damages for emotion distress due to his employer's use of the results of the polygraph administered to plaintiff by the police and his subsequent demotion as a consequence of the results of the examination. *Id.* at 866.

In their brief, Bonds and Gadson draw a comparison to the evidence in their case supporting non-economic damages and the evidence presented in *Mennen*. Bonds, like the plaintiff in *Mennen*, testified that he was depressed as a result of his termination, felt sick to his stomach and lost weight during the time he was unable to find comparable employment. (Bonds/Gadson

Br. in Opp. to Flagship Post-trial Mot., at 18.)  He felt that his termination derailed his plans for his life, family and career.  *Id.*  Both Bonds and his wife cried over his termination, and his depression put a strain on their marriage.  *Id.*  Despite the similarity in the impact on their mental states, Bonds was awarded $200,000 and the plaintiff in *Mennen* only $15,000 for emotional distress.

Gadson's evidence of emotional distress was also limited. She testified that her termination caused her to be "devastated, destroyed and crying."  *Id.* at 19.  Given her checkered pre-Flagship employment and personal history, it might be argued that a higher emotional distress award was justified.[4]  However, an award of damages twenty times higher than the largest reported award for emotional distress in an EPPA case is not reasonable in light of the scant evidence Gadson presented at trial relevant to this issue.

Lyles did not testify regarding the emotional impact of her termination.  Lyles concedes that she presented no direct evidence of emotional distress and argues instead that a

---

[4]Gadson was suffering from cancer at the time of her termination.  She testified that she resorted to smoking marijuana in order to self-medicate her chemotherapy-related nausea, and was subsequently jailed on charges related to her drug use.  The Court notes that a plaintiff may only recover damages proximately caused by the defendant's conduct.  Gadson's act of using an illegal drug constituted a superseding intervening cause of her incarceration, and therefore she may not recover from Flagship damages resulting from her incarceration. *See Schick*, 307 F.3d at 615.

reasonable jury could infer significant emotional distress from the facts of her situation.  (April 15, 2005, Ltr. Br. from M. Pfeffer,at 2.)  A plaintiff must present evidence of *actual injury* in order to recover damages for emotional distress - an inference of injury is not sufficient.  *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988).  In the absence of any direct evidence, the jury's award of $100,000 to Lyles for emotional distress is shocking and clearly unreasonable.[5]

The nearly $4,000,000 verdict in this case is grossly excessive and bears no rational connection to the evidence.  In such a situation, remittitur is insufficient and the Court must order a new trial.

## IV.

Although Flagship's arguments with regard to the Plaintiffs' entitlement to damages are rendered moot by the decision to grant a new trial, the Court will address these issues now as a guide for further proceedings.  Flagship contends that EPPA does not authorize non-economic or punitive damages, and that the evidence does not support the jury's award of lost wages, non-economic

---

[5]None of the three Plaintiffs testified that they sought counseling as a result of their alleged emotional distress arising from their termination by Flagship, nor does the record otherwise indicate that they were treated for emotional distress. They did not offer any expert testimony documenting the symptoms of their emotional distress or opining as to any causal connection between the distress and their firing.

damages or punitive damages.

The enforcement provisions of the EPPA provide in relevant part that an employer who violates the statute "shall be liable for such legal or equitable relief as may be appropriate, including, but not limited to, employment, reinstatement, promotion, and the payment of lost wages and benefits." 29 U.S.C. § 2005(c)(1).  The Court holds that this provision allows for the award of non-economic damages.  The Court declines to reach the issue of whether the statute authorizes punitive damages, as the Court finds such damages are not justified on the facts of this case.  Additionally, the Court finds that the jury's awards for lost wages and emotional distress are not supported by the evidence.

### A.

This Court agrees with the analysis of the Northern District of Iowa in *Mennen* in reaching the conclusion that non-economic damages are available under EPPA.  *See* 951 F. Supp. at 864 n.29. Although the specific list of damages in § 2005(c)(1) includes only economic damages, the list is prefaced with the phrase "including, *but not limited to*" indicating that Congress did not intend the list to exclude other forms of relief. 29 U.S.C. § 2005(c)(1); *Mennen*, 951 F. Supp. at 864 n.29.

*Mennen* looked to court decisions interpreting similar language in § 16(b) of the Fair Labor Standards Act ("FLSA") for

guidance in determining whether non-economic damages are "appropriate" relief for violations of EPPA.  951 F. Supp. at 864 n.29.  Section 16(b) provides for "legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  *Mennen* adopted the conclusion of the Seventh Circuit in *Travis v. Gary Community Mental Health Ctr.*, 921 F.2d 108, 111-12 (7th Cir. 1990), that damages for emotional distress are "appropriate" relief for intentional torts, and such damages were available under § 16(b) of FLSA.  951 F. Supp. at 864 n.29.  Based on this interpretation of similar language in FLSA, the Northern District of Iowa concluded that damages for emotional distress were available under EPPA.  *Id.*

The only court in this circuit to pass on the scope of § 16(b) of FLSA agreed with the conclusion reached in *Travis*.[6] *See Marrow v. Allstate Security & Investigative Svcs., Inc.,* 167 F. Supp. 2d 838, 842 (E.D. Pa. 2001).  The Eastern District of

---

[6]Flagship asserts in its brief that other decisions from the Eastern District of Pennsylvania have disagreed with *Marrow*. However, the only case it cites concerns the availability of nominal damages under ADEA, and makes no statements, even in dicta, as to the availability of damages for emotional distress under § 16(b).  *See Beverly v. Desmond Hotel & Conf. Ctr.*, No. Civ. A. 02-6712, 2004 WL 163498 (E.D. Pa. Jan. 23, 2004).  The Court could not locate any other opinions disagreeing with *Marrow*.

Pennsylvania did not address the availability of damages for emotional distress under § 16(b), but concluded that the provision permitted the award of punitive damages. *Marrow* noted that the only other circuit to address the issue disagreed with *Travis*, but the Eastern District found unpersuasive the reasoning of the Eleventh Circuit in *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928 (11th Cir. 2000).[7]

Flagship relies on the interpretation of similar language in Title VII (prior to the Civil Rights Act of 1991) and the Age Discrimination in Employment Act ("ADEA") to prohibit the award of non-economic damages, rather than the interpretation of FLSA, and argues that EPPA should be similarly interpreted. Flagship contends that EPPA, like pre-1991 Title VII and ADEA, "focuses on 'legal injuries of an economic character'" and therefore recovery under EPPA should be similarly limited to only damages for lost wages. (Def. Br. at 22-23)(citing *United States v. Burke*, 504 U.S. 209, 239 (1992)(holding that Title VII prior to the 1991

---

[7]The court in *Marrow* objected to *Snapp*'s application of the *eiusdem generis* because § 16(b) prefaced the list of permitted forms of relief with the language "including without limitation," indicating that by including the list Congress did not mean to exclude other forms of relief. 167 F. Supp. 2d at 844. The Eastern District also disagreed with *Snapp*'s conclusion that if punitive damages were awarded under § 16(b), they would have to be awarded in every case because retaliation is "inherently willful." *Id.* Finally, *Marrow* rejected the analogy to § 7(b) of the ADEA drawn by the Eleventh Circuit, which sets out the damages available for violations of the statute. *Id.* at 845-46. The court was unpersuaded that the syntactical similarity of the damages provisions of the two statutes meant that they had identical affect. *Id.*

amendments did not allow for compensation of "the other traditional harms associated with personal injury, such as . . . emotional distress")).

Flagship overlooks a crucial distinction between EPPA, Title VII and ADEA.  Title VII and ADEA are anti-discrimination statutes intended to "restor[e] victims, through back pay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination." *Burke*, 504 U.S. at 239.  EPPA, however, is not strictly an anti-discrimination statute and its prohibitions indicate that it was intended to focus on more than just "legal injuries of an economic character." *Burke*, 504 U.S. at 239.

Several provisions within EPPA demonstrate that the statute was intended to protect the privacy rights of employees, as well as to restore employees to the "wage and employment positions they would have occupied absent" the unlawful conduct under EPPA. Section 2002 describes the acts specifically prohibited by EPPA. The first provision bars an employer from "directly or indirectly, [] requir[ing], request[ing], suggest[ing], or caus[ing] any employee or prospective employee to take or submit to any lie detector test."  29 U.S.C. § 2002(1).  The second provision of § 2002 prohibits an employer from "us[ing], accept[ing], refer[ring] to, or inquir[ing] concerning the results of any lie detector test of any employee or prospective employee."  29 U.S.C. § 2002(2).  These provisions recognize that

24

the offensiveness of employers' use of polygraph examinations in
making employment decisions stems both from the intrusiveness of
the tests themselves, in addition to any adverse employment
actions taken as a result of the tests.[8]

Other provisions of EPPA reflect the statute's concern for
the privacy rights of employees.  EPPA allows employers to
administer polygraph examinations in limited circumstances, and
Section 2007 sets out restrictions on the use of statute's
exemptions, including a section outlining the rights of the
examinee.  29 U.S.C. § 2007(b).  When such tests are permitted,
the examiner may not ask the employee questions "in a manner
designed to degrade, or needlessly intrude on, such examinee."
29 U.S.C. § 2007(b)(1)(B).  Additionally, the examiner may not
ask questions regarding "(i) religious beliefs or affiliations,
(ii) beliefs or opinions regarding racial matters, (iii)
political beliefs or affiliations, (iv) any matter relating to
sexual behavior; and (v) beliefs, affiliations, opinions, or
lawful activities regarding unions or labor organizations."  29
U.S.C. § 2007(b)(1)(C).[9]

_____

[8]Section 2002(3) and (4), by contrast, address instances
where employers take adverse action against employees based on an
employee's refusal to take a polygraph examination, the results
of any test, or an employee's institution of a complaint under
the EPPA.  29 U.S.C. § 2002(3),(4).

[9]See also S. Rep. 100-284, at 50 (1988), reprinted in 1988
U.S.C.C.A.N. 726, 738 ("The bill would eliminate the invasion of
privacy inherent in the preemployment and random tests by

EPPA was intended to protect employees from wrongs that are not remediable by the award of back pay.  Under Flagship's interpretation of § 2005(c)(1), if an employer asked an employee to take a lie detector test in contravention of § 2002(1), the only remedy available would be for the economic injury suffered by the employee, leaving the violation of the employee's privacy rights unremedied.  The structure of § 2002 indicates that EPPA was designed to do more than just restore employees to their pre-polygraph employment status, but also to provide relief for the intangible harms associated with invasions of privacy, such as emotional distress.

B.

The Court declines to reach the issue of whether the EPPA provides for the award of punitive damages, because in any event, such an award is not justified based on the facts of this case. *See Mennen*, 951 F.Supp. at 866.

When statutes expressly or implicitly authorize punitive damages, the availability of such damages is generally limited to instances of malicious or reckless violations of the law.  *See,*

---

prohibiting these tests entirely.  The bill also affords privacy protections to the employees subject to tests not prohibited by this bill by proscribing certain classes of irrelevant personal questions."); Peter C. Johnson, *Banning the Truth-Finder in Employment:  The Employee Polygraph Protection Act of 1988*, 54 Mo. L. Rev. 155, 163 (1989) ("The Act attempts to provide a balance between the competing interests of the employee's right to privacy and the employer's right to protect his business.").

26

*e.g.,* 42 U.S.C. § 1981a(b)(1) ("[a] complaining party may recover punitive damages . . . if . . . the respondent engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual"); *Kolstad v. American Dental Association*, 527 U.S. 526, 536 (1999) (interpreting § 1981a(b)(1) in the context of a Title VII action)("an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages"); *Smith v. Wade*, 461 U.S. 30, 56 (1983)(holding that punitive damages are available under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").  The focus is ultimately on the actor's state of mind.  *Kolstad*, 527 U.S. at 535.

The evidence does not establish that Flagship's actions rise to this level.  Tunney, the Human Resources Manager, was the only Flagship manager to testify that she was aware that an employer could not request that its employees take a polygraph examination.[10]  (Tr. 644-45.)  She believed in good faith,

_____

[10]Plaintiffs do not assert in their brief that the actions of the outside investigator justify the imposition of punitive damages upon Flagship.  Nor could they, because, as Flagship argues, Plaintiffs have offered no evidence that anyone at Flagship authorized the investigator to ask Plaintiffs to take polygraph examinations nor did they ratify his actions, or that Flagship acted recklessly in hiring an unfit investigator.

however, that the company could request that Blake take the test as part of the ongoing theft investigation because it was not a condition of Blake's employment.  (Tr. 703-6, 721-22, 764-66.) Additionally, Tunney did not know that Plaintiffs had been asked to take polygraph examinations until after the fact, as Romanowski did not consult with her prior to approaching Plaintiffs.  (Tr. 545-47, 643-44, 713-15.)  Plaintiffs' evidence is insufficient to demonstrate that Flagship acted with malice or reckless indifference to Plaintiffs' rights under EPPA.

C.

Although the excessiveness of the jury's verdict was discussed in more detail above, the Court reiterates that the damages awarded for emotional distress and lost wages are not supported by the evidence.

In particular, the Court can find no logical connection between the size of the awards for lost wages and the evidence presented by Plaintiffs.  Bonds presented evidence that he made approximately $140,000 from 2000 through 2003 and expected to make $360,000, had he remained at Flagship, for a loss of $220,000.  The jury awarded him approximately $40,000, or almost twenty percent, more than that loss.  Lyles presented evidence that she made approximately $75,000 over that period, but expected to make $120,000 had she stayed at Flagship, for a difference of $45,000.  The jury awarded her nearly doubled that

28

amount.  Gadson made approximately $40-50,000 in that period and had expected to make $200,000.[11]  Her award was roughly equivalent to the loss she suffered, however, she spent part of that time in jail and cannot recover lost wages from that period.

While a jury's calculations of lost wages do not have to be precise, they must be justified by the evidence presented.  *Cf. Bianchi v. City of Philadelphia*, 80 Fed. Appx. 232, 238 (3d Cir. 2003).  Here, the amounts appear to be either excessive or randomly awarded.

V.

Flagship is entitled to a new trial solely on Plaintiffs' claim under EPPA.  Plaintiffs' motions for post-judgment relief

---

[11]Bonds and Gadson argue that their lost wages awards should be assessed by comparing their actual earnings from 2000 to 2003 with what they projected their earnings would be had they remained at Flagship.  These projections included significant and speculative increases.  For Bonds, the increase was estimated to be approximately 28% of his earnings from the prior year, and for Gadson, a 43% increase.  If the Court compares their actual post-Flagship earnings with what Plaintiffs made in their final year with the company, the lost wages awards appear even more excessive.  Based on earnings of $70,500 in his final year at Flagship, Bonds suffered a loss of approximately $140,000, yet he was awarded more than $260,000.  Gadson suffered a loss of approximately $100,000, based on her final year earnings of $35,000, yet was awarded $145,000. Regardless of the comparison figure used, however, the jury's lost wages awards are still excessive given the evidence offered by Plaintiffs.

Flagship argues that the Court erred in excluding its evidence of a downturn in the market that reduced commission-based earnings of Flagship telemarketers in the period following Plaintiffs' terminations.  The Court will defer a decision on this issue until retrial.

are rendered moot by the Court's ruling, and as such, must be

denied.  The Court will enter an appropriate order.


Date: May <u>19th</u>, 2005

                              <u>s/Joseph E. Irenas</u>
                              JOSEPH E. IRENAS
                              Senior United States District Judge

30